# 2002 DTA 105

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL III DE ARECIBO/UTUADO

DEPARTAMENTO DE LA FAMILIA
Apelado

v.

JENNY PINTO ROSADO
Apelante

Núm. KLAN-2001-01174

San Juan, Puerto Rico, a 10 de junio de 2002

Panel integrado por su Presidente, el Juez Soler Aquino,
y los Jueces Colón Birriel y Escribano Medina

Colón Birriel, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

### I

Jenny Pinto Rosado, (en lo sucesivo *"Pinto Rosado"*) solicita la revocación de una **Sentencia** dictada el 6 de junio de 2001, archivada en autos copia de su notificación el 8 de agosto de 2001, por el Tribunal de Primera Instancia, Sala Superior de Arecibo (el *"Tribunal"*), en el caso del *Departamento de la Familia v. Jenny Pinto Rosado*, Civil Número CMM 2000-0111, sobre Ley 342 (Maltrato de Menores). El referido dictamen otorgó la custodia legal permanente del menor K.S.D.J. (en lo sucesivo *"el menor"*), al Departamento de la Familia (Departamento) a todos los fines legales, y determinó que el Departamento por conducto de la Trabajadora Social, coordinaría con Mepsi Center para que los profesionales que atendían al menor, determinaren si se iban a dar las relaciones de la bisabuela (Pinto Rosado) con el menor. El 17 de agosto de 2001, Pinto Rosado presentó escrito intitulado *"Moción Solicitando Determinaciones de Hechos y Conclusiones de Derecho"*. Acogida la referida moción, el Tribunal emitió una nueva sentencia el 24 de septiembre de 2001, notificada el 19 de octubre de 2001, incluyendo entre sus conclusiones de derecho: a) que el mejor bienestar del menor se lograba ubicándolo en un hogar donde pudiera seguir las indicaciones de los profesionales que habían estado dándole servicios; b) privó a Pinto Rosado de la custodia del menor, concediéndole la custodia al Departamento; y c) advirtió que la ubicación del menor se hiciera en coordinación con Mepsi siguiendo las recomendaciones de los profesionales de dicha institución. Con el beneficio de las comparecencias de las partes, resolvemos.

### II

Surge de autos que Pinto Rosado es la bisabuela del menor K.S.D.J. y que se hizo cargo de éste desde que tenía meses de nacido, toda vez que sus padres biológicos nunca se ocuparon de él. Posteriormente, le fue otorgada su custodia legal por medio de una **Resolución** emitida por el Tribunal Municipal de Manatí, el 14 de septiembre de 1990.

Debido a que el menor padecía de **Déficit de Atención con Hiperactividad**, mientras convivía en el hogar de su bisabuela, recibía los servicios de educación especial, en la escuela elemental Teodomiro Taboas, en la municipalidad de Manatí.

El 13 de septiembre de 2000, el Departamento de la Familia, a través del Programa de Emergencias Sociales (PES), intervino con esta familia, por alegaciones relacionadas a la higiene del hogar y luego de que un agente de la policía informara que el menor estaba agrediendo a su bisabuela. Por tal motivo, la Trabajadora Social, Arleen Rivera González, sometió una Petición solicitando la remoción del menor, en la que expresó:

*"Existen claros indicadores en donde la seguridad física y emocional del menor se encuentra en riesgo por alegatos de negligencia en área de supervisión y manejo. Hogar se encuentra en condiciones infrahumanas. Inhabitable para la familia, donde se observa comida descompuesta, mal olor, basura regada, ropa sucia y limpia regada, chatarra en toda la casa. En el día de hoy 09/13/00, se encontraba menor agrediendo a la bisabuela."*

En virtud de ello, en **Resolución y Orden** del 13 de septiembre de 2000, el Tribunal ordenó que el menor fuera puesto bajo la custodia provisional del Departamento, y señaló vista de seguimiento a celebrarse el 29 de septiembre de 2000, la que fue transferida para el 4 de octubre. Mientras ello ocurría, el Departamento trató de ubicar al menor en varios hogares de crianza, pero ello resultó imposible debido a la conducta presentada por éste; por lo que fue ingresado en el Hospital Mepsi Center.

Luego de celebradas varias vistas de seguimiento, se celebró la vista final de custodia el 6 de junio de 2001, en la que las partes desfilaron la siguiente prueba, de conformidad con el Proyecto de Exposición Narrativa de la Prueba Oral:

## I. Dra. Angela Del Muro (Testigo del Departamento de la Familia)

Declaró que trabaja en el Mepsi Center en calidad de Directora del Residencial, desde noviembre de 2000; y que es la doctora que brinda tratamiento al menor.

Indicó que conoce a K.S.D.J. desde el 26 de noviembre de 2000. Que el diagnóstico inicial del menor fue de trastorno de Conducta Desafiante, pero que luego ella lo evaluó y diagnosticó Déficit de Atención con Hiperactividad y Trastorno de Conducta Desafiante en segundo término. Entendía que próximamente habría que darlo de alta porque ha mejorado muchísimo.

En cuanto a la recomendación sobre la custodia en términos de ubicación, aclaró que la función de ella era hablar sobre los estados, no era su función si la abuelita es candidata o no para la custodia del menor. Sí indicó que el menor necesita un ambiente de estructura, donde se pueda controlar.

Nunca entrevistó a Jenny Pinto, pero dijo que a través del Departamento de la Familia la han mantenido al tanto de lo que ha ocurrido.

Añadió que K.S.D.J. tiene una inteligencia sobre lo normal y no tiene problemas de aprendizaje. Su diagnóstico se puede trabajar. Necesita un hogar estructurado, consistencia en las instrucciones y en el tratamiento, además de envolverlo en actividades extracurriculares. En las facilidades que estaba el menor no tenía unos controles y era difícil de controlar. Sobre las relaciones abuelo-filiales dijo que han sido supervisadas y han sido adecuadas.

Ante preguntas realizadas por el Procurador Vélez Torres, la Dra. Angela del Muro indicó que en las relaciones abuelo-filial había personal pendiente porque inicialmente, cuando la Sra. Pinto iba a visitar al menor le decía que la ropa que tenía no era de él, hacía preguntas que alteran la dinámica que ocurría y que afectaban también a los demás niños. El menor se quedaba molesto, y eso no ayuda.

En el recontrainterrogatorio, a la pregunta de si la Sra. Pinto había participado en el tratamiento que se le estaba dando al menor en Mepsi Center, contestó que "*la custodia la tenía el Departamento*". Finalmente, sobre los incidentes que se han suscitado en las relaciones abuelo-filiales admitió que han sido por el estilo de preguntar de la Sra. Pinto, pero el contenido era por la preocupación real que tenía la Sra. Pinto por su nieto.

## II. Dr. José Arturo Juarbe Ortiz (Testigo del Departamento de la Familia)

Tiene especialidad en Psiquiatría General, y trabaja en Mepsi Center desde el 1978 en calidad de Psiquiatra. Fue contratado para evaluar a la Sra. Pinto. Indicó que ésta es cooperadora, desarrollada, lógica, coherente, bien nutrida y no hay enfermedad sicótica. Es sobre protectora, castrante, no permite que el niño haga lo "*que diría yo que debe*".

Cuando se refiere a castrante, se refiere a que no deja que haga las cosas de un niño de su edad, lo mantiene en la casa. El menor necesita un ambiente normal. Catalogó la relación como enfermiza.

El niño cumplió 12 años y va a crecer y la Sra. Pinto va a *"decrecer"*. Ni física ni mentalmente está capacitada para bregar con él. El niño necesita ambiente estructurado. *"El va ser un riesgo para la señora"*. Sobre la recomendación final sobre la custodia física o legal, dijo *"que necesita ambiente estructurado con controles externos"*. Se le preguntó que pasaría si se le entregara la custodia a la Sra. Pinto y él contestó que recomendaría que haya otras personas como ama de llaves. Reiteró que el niño se opone a la sobreprotección.

En el contrainterrogatorio contestó en la afirmativa, ante la interrogante de si con apoyo la Sra. Pinto podía proveerle al menor un ambiente adecuado. Además indicó que ésta tiene la capacidad cognoscitiva para recibir la información.

Por otra parte, ante las preguntas realizadas por el Procurador Vélez Torres, indicó que sería difícil el cambio para la Sra. Pinto porque ella es un *"árbol viejo que cuando se dobla es sumamente difícil de enderezar, la única forma de enderezar un árbol viejo es cortándolo"*. Manifestó además que la Sra. Pinto tiene 74 años, que no tiene trastornos sicóticos, que tiene memoria preservada, pero que nadie sabe cuánto tiempo tendrá la memoria preservada. Además explicó que el menor agrede a la Sra. Pinto.

### III. Lisa Morales (Trabajadora Social del Departamento de la Familia)

Indicó que conoce al menor desde septiembre de 2000 cuando le pasan el caso para seguimiento. Su trabajo en el caso consistió en visitas a la casa de Jenny (que cuando no se encontraba, se dejaban cartas). Se hizo un plan de servicio, se discutió con el personal de Mepsi, se matriculó en escuela de Bayamón y se le dio en parte orientación a la Sra. Jenny Pinto.

Con relación al servicio de ama de llaves, indicó que Jenny Pinto dialogó con la Trabajadora Social, Alma Rivera y llenó todo, pero desistió de recibir el ama de llaves porque entendía que si no tenía el menor, no necesitaba el ama de llaves. Añadió que nunca entró a la casa porque cuando fue, la Sra. Pinto no estaba; por lo que coordinó en la oficina que cuando ella (Pinto Rosado) estuviera dispuesta a que la Trabajadora Social viera el hogar, se lo comunicara a ella. Manifiesta que le llegó a decir que *"si la visitaba tal día y ella le dijo que no, porque no había recogido el hogar"*.

Con relación a que Pinto Rosado entendiera la problemática, la Trabajadora Social testificó que ella entiende que Jenny no comprende ni entiende que el menor necesita de una ayuda, que necesita, de unos medicamentos, y necesita de un desarrollo social.

En el contrainterrogatorio aceptó que Pinto Rosado nunca recibió orientaciones de parte de los profesionales de Mepsi Center. A la pregunta de cuál era la base científica para su recomendación de que se otorgue la custodia legal al Departamento de la Familia, indicó que el menor es de difícil manejo, se muestra agresivo sin medicación, la Sra. Pinto no tenía controles.

A preguntas del Procurador Vélez Torres indicó que en cuanto a las relaciones abuelo-filial la única dificultad era la transportación.

A las preguntas realizadas durante el recontrainterrogatorio manifestó que los elementos para cambiar la recomendación (de una primera recomendación de retorno al hogar, a una de que se conceda la custodia legal del menor, al Departamento de la Familia), son, porque *"primero el Departamento de la Familia exige que por primera vez el plan de permanencia de un menor sea retorno al hogar biológico aún cuando yo entienda o perciba por otras cosas que desde un principio se debió haber dicho que se entregara custodia legal permanente*

*al Departamento".*

Ante la pregunta de si conoce que la Ley 342 faculta a que en ciertas ocasiones el plan de permanencia no sea retorno al hogar, cuando se dan unas situaciones específicas que dispone la ley, respondió que sí lo conocía, pero admitió que ninguna de esas circunstancias se daba en el caso de Pinto Rosado.

## IV. Aida Iris Domínguez González (Primer Testigo de la parte apelante)

Testificó que es maestra en la Escuela Taboas donde estudiaba el menor. Conoce al menor desde que estaba en primer grado. Le dio clases en tercer y quinto grado. Indicó que observaba cuando Pinto Rosado llevaba al menor a la escuela, lo buscaba en las tardes y al medio día. Se refirió a Pinto Rosado como muy responsable.

En el contrainterrogatorio indicó que veía a Jenny todos los días en la escuela. Explicó que para ir al salón donde estaba tenía que pasar por frente de la oficina. Los veía hablando y caminando. Alrededor de cinco veces al día, a veces los veía en la biblioteca y a veces se sentaban en la oficina. Testificó además que desconoce la situación del hogar.

A preguntas realizadas por el Procurador indicó que apreciaba mucho a Jenny Pinto y K.S.D.J. porque le dio clases de salud. Indicó que muchos padres iban a la escuela todos los días, se llevan sus hijos a las doce y luego los buscan en la tarde. Le preguntó que si eso era sobre proteger, a lo que ella contestó que no, que eso era responsabilidad y que ella haría lo mismo.

Sobre la hora del recreo indicó que era de 9:00 a.m. a 9:10 a.m.; que si Pinto Rosado no podía comprar merienda en la mañana, se la llevaba en ese momento y luego se iba. Los padres que no pueden comprar la merienda antes de la hora de entrada la llevan a la hora de merienda.

Añadió que durante la hora de almuerzo, los niños juegan, Jenny iba todos los días, a veces se llevaba al niño a esa hora. El niño participaba de los juegos en la hora de almuerzo, el niño almorzaba en el comedor. Finalmente sostuvo que siempre veía al niño jugando y que es un niño normal.

## V. Alvaro Girau (Segundo testigo de la parte apelante)

Se estipuló por las partes que el testimonio de este testigo sería que: es policía escolar de la escuela donde estudiaba el menor; que Pinto Rosado llevaba al menor en la mañana, iba a la hora de almuerzo; y lo recogía en la tarde; y que es una práctica común en las escuelas públicas que los padres vayan a esas horas. Observaba una relación afectiva y de apoyo entre Pinto Rosado y el menor.

## VI. Dr. Víctor Lladó (Tercer testigo de la parte apelante)

Médico especializado en psiquiatría con énfasis en la práctica de la psiquiatría ocupacional y forense. Indicó que conoce a Pinto Rosado porque le fue referida para evaluación. Sobre los hallazgos realizados indicó que obtuvo contestaciones lógicas, no encontró síntoma sicótico, tenía una conducta apropiada, dialogaba adecuadamente, no hubo evidencia de trastornos sicomotrices, ni de trastornos cognoscitivos, se encontró una memoria reservada dentro de los linderos normales.

La Sra. Pinto a veces se detiene un poco en su flujo normal, en ocasiones presenta ciertas actitudes, se enfoca en el tema del menor, en el bienestar del menor. Esta situación a veces es excesiva, casi rayando en obsesión. Esto se debe al vínculo emocional que hay entre ellos. Hubo una remoción súbita e inesperada. Añadió que Pinto Rosado tiende a ser posesiva, es un eje de relación que ella necesita ayuda para negociarlo airosamente.

Sobre el menor indicó que éste le había manifestado que le eran gratas las visitas de Pinto Rosado, que no se sentiría temeroso de regresar al hogar, y no presentó ningún temor ni sensación adversa sobre quedarse o acudir a otros sitios.

Sobre la relación de la Sra. Pinto y el menor opina que es el eje fundamental de apoyo y de estructura personal que tiene el menor, es su figura materna, hay un apego entre ellos, hay comunicación emocional productiva, de ese enlace es que vamos a depender para poder ayudar a este menor. Testifica que según los tratadistas es positiva y necesaria la continuidad en su relación primaria, no se debe cercenar, no se debe menguar ni afectar.

Sostuvo además que, de ordinario, la práctica necesaria de la psiquiatría de niños es indispensable, que los padres se tienen que envolver activamente y ser partícipes del esfuerzo terapéutico, brindarle la ayuda, el apoyo, la orientación necesaria. Entiende que en este caso va ser necesario que la Sra. Pinto reciba una ayuda psicoterapéutica, eso debe consistir no meramente en informarle de la condición del menor, ni en informarle los medicamentos que debe utilizar. Necesita unas técnicas para desarrollar y disciplinar a este menor en la forma más correcta.

En el contrainterrogatorio indicó que la Sra. Pinto necesita ayuda. Sabe que se ha tratado de visitar el hogar, pero ella ha resistido, y esa es un área que necesita trabajarse. A preguntas sobre el tiempo que lleva el caso ante el Tribunal, el doctor opina que de perdurar la conducta de la Sra. Pinto, no sería conveniente. Además indicó que conoce que el menor se ha portado de forma agresiva para con la Sra. Pinto y eso fue parte del incidente que dio paso a la remoción.

Sobre el aspecto de la sobreprotección añadió que *"puede ocurrir y ocurrió en algún grado, en parte por esa protección, no digo que fuera lo primordial por [sic] el niño, tiene una condición y conductas disfuncionales"*.

Sobre la ubicación del menor en Orocovis indicó que no sería razonable, por los vínculos afectivos. Se le preguntó si esos vínculos se podían crear en cuestión de tiempo, a lo que contestó que al cabo de un tiempo puede darse, pero en este caso no sería en el mejor bienestar del menor. Lo catalogó como riesgoso y oneroso. Eso sólo se hace cuando es indispensable.

A preguntas realizadas por el Procurador indicó que no está de acuerdo con el Dr. Juarbe cuando dice que Pinto Rosado era castrante, porque lo único que dijo para explicar el término fue que tendía a sobreproteger e interfería, según él, con el desarrollo. Añadió que eso no se puede comparar con su opinión de rayando en obsesión. Indicó por otra parte que no ha visitado el hogar, y que en cuanto a la comunicación con el menor éste era un poco retraído.

En el redirecto aclaró que cuando dice que raya en lo obsesivo se refiere a que existe un pensamiento tan presente y reiterado, que la persona tiene dificultad en apartarse; aunque esto sujeto a cambio.

Con la prueba antes resumida, quedó sometido el caso; emitiendo el Tribunal la sentencia que nos ocupa, el 6 de agosto de 2001, en la que, como hemos informado, entre otros, se cedió permanentemente la custodia legal del menor al Departamento de la Familia. Inconforme, Pinto Rosado recurre alegando que el Tribunal incurrió en los siguientes errores:

*"1. Erró el Honorable Tribunal de Instancia al privar a la Sra. Jenny Pinto de la custodia del menor K.S.D.J. sin salvaguardarle el debido proceso de ley.*

*2. Erró el Honorable Tribunal de Instancia en su interpretación y aplicación a los hechos del artículo 46 de la Ley 342 de 16 de diciembre de 1999, sobre esfuerzos razonables para la reunificación familiar.*

*3. Erró el Honorable Tribunal de Instancia al no incluir a la Sra. Jenny Pinto en el plan de tratamiento integral según lo requiere la Ley de Salud Mental.*

*4. Erró el Tribunal al ordenar el cierre y archivo del caso sin establecer relaciones entre el menor K.S.D.J. y la Sra. Jenny Pinto."*

## III

Por encontrarse relacionados los primeros tres señalamientos de error, procederemos a discutirlos en conjunto.

La Constitución de Puerto Rico, 1 L.P.R.A., Art. II, § 7, dispone en lo pertinente que: *"Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes"*. El debido proceso de ley tiene dos vertientes: la sustantiva y la procesal. *Rivera Santiago v. Secretario de Hacienda*, 119 D.P.R. 265 (1987).

Bajo la primera, los tribunales examinan la validez de la parte sustantiva de una ley a la luz de la Constitución. La segunda, de ámbito procesal, toma en cuenta las garantías procesales mínimas que el Estado debe proveerle a un individuo al afectarle su vida, propiedad o libertad. Su aplicabilidad procesal requiere un interés individual de libertad o propiedad. Cumplida esta exigencia, entonces hay que determinar cuál es el procedimiento exigido.

La característica medular de este derecho es que el procedimiento que siga el Estado sea justo. La garantía esencial de la cláusula de debido proceso es que sea justa. El procedimiento debe ser fundamentalmente justo al individuo en la resolución de los hechos y derechos que sirven de base para aquellas acciones gubernamentales que le privan de su vida, libertad o propiedad. Si bien situaciones diferentes pueden imponer diferentes tipos de procedimientos, siempre está el requisito general de que el proceso gubernamental sea justo e imparcial. (Citas Omitidas.) *Id,* a las págs. 273-274.

En casos como el de autos, sobre privación de custodia, el Tribunal Supremo de los Estados Unidos, ha expresado lo siguiente en cuanto al debido proceso de ley:

*"The fundamental liberty interest of natural parents in the care, custody, and management of their child is protected by the Fourteenth Amendment, and does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. A parental rights termination proceeding interferes with that fundamental liberty interest. When the state moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." Santosky v. Kramer*, 455 U.S. 745 (1982).

Así pues, como parte de ese debido proceso, la Ley 342 de 16 de diciembre de 1999 dispone que el Departamento de la Familia deberá realizar esfuerzos razonables para preservar la unidad familiar antes de la remoción del menor; y después de ésta, con el fin de hacer posible el retorno del menor a su hogar.

En su artículo 2, 8 L.P.R.A. § 441 (l), la referida ley define los esfuerzos razonables de la siguiente manera:

*"Esfuerzos Razonables - Significa todas aquellas actividades y servicios que se ofrecen al padre, a la madre o persona responsable por el bienestar de un menor y a estos menores dentro y fuera del hogar, en coordinación con entidades públicas y privadas, que garanticen la seguridad y bienestar de los últimos. Los esfuerzos razonables van dirigidos a evitar la remoción de los menores de su hogar natural, reunificar la familia cuando se ha removido a los menores y lograr una familia biológica. No se harán esfuerzos razonables para las situaciones previstas en la sec. 443 k de este título."*

La que en lo pertinente dispone:

### "§ 443k Patria potestad – Esfuerzos Razonables

*Al momento de un tribunal determinar los esfuerzos razonables a ser realizados respecto a un menor, según dispone la sec. 443c de este título y esta sección, y al momento de realizarse estos esfuerzos razonables, el mejor interés del menor será la principal consideración.*

*Salvo lo dispuesto más adelante en esta sección, se harán esfuerzos razonables para preservar la integridad familiar previo a la remoción de un menor de su hogar; y luego de éste haber sido removido del mismo, se realizarán esfuerzos razonables por un período que no excederá de los seis (6) meses siguientes a la remoción para reintegrar al menor de forma segura al hogar.*

*(1) Los siguientes criterios serán utilizados para concluir que se han o no realizado esfuerzos razonables:*

*a. Naturaleza de los servicios ofrecidos o provistos por el Departamento.*

*b. Selección de la agencia o servicio al cual se refirió al padre, la madre, o persona responsable por el bienestar del menor para satisfacer sus necesidades.*

*c. Diligencia de la agencia al hacer tales servicios disponibles o accesibles al padre, la madre o persona responsable por el bienestar del menor.*

*d. Intentos anteriores hechos por la agencia para intervenir o proveer servicios.*

*e. Razones por las cuales otros servicios o esfuerzos para mantener al menor en su hogar no progresaron.*

*f. Plan de Permanencia establecido inmediatamente luego de la remoción.*

*(2) No se harán esfuerzos razonables previos a la remoción de un menor de su hogar en las siguientes circunstancias:*

*a. Si un padre, una madre, o persona responsable por el bienestar del menor sufre de una incapacidad o deficiencia mental, según determinada por un profesional de la salud, y la misma es de tal magnitud que le impide atender adecuadamente a un menor y garantizar su seguridad e integridad física, mental emocional y/o moral.*

*b. [...]*

*c. [...]*

*d. [...]*

*e. El padre, la madre o persona responsable del bienestar del menor, ha causado daño físico o ha incurrido en maltrato y/o maltrato por negligencia poniendo en riesgo la salud e integridad física, mental, emocional y/o moral del menor.*

*f. [...]*

*(3) No se harán esfuerzos razonables para reunir a un menor con su padre, madre o persona responsable por*

*su bienestar en las siguientes circunstancias:*

*a. Los esfuerzos para cambiar el comportamiento del padre, de la madre, o persona responsable por el bienestar del menor, no han sido exitosos luego de seis (6) meses de haberse iniciado según la evidencia presentada en el caso.*

*[...]".*

En el caso de autos, Pinto Rosado alega que se le violó el debido proceso de ley, porque nunca fue adiestrada por personal capacitado sobre modificación de conducta ni sobre las necesidades clínicas del menor. Además, alega que no se realizaron esfuerzos razonables para devolver al menor al hogar, y que se violó la Ley de Salud Mental, Ley 408 del 2 de octubre de 2000, la que establece, en lo pertinente, que en aquellos casos de menores que reciban los servicios de salud mental, siempre se requerirá que el familiar más cercano participe en la formulación y revisión del Plan Individualizado de Tratamiento, Recuperación y Rehabilitación. No le asiste la razón. Veamos.

Conforme a las disposiciones antes citadas, previo a la remoción del menor de su hogar, el Departamento no tenía que realizar esfuerzos razonables para evitar la remoción, toda vez que la falta de higiene ponía en riesgo la salud e integridad física del menor. § 443 K 2(e), *supra*. Por otro lado, tampoco era necesario que el Departamento continuara haciendo esfuerzos razonables para el retorno del menor al hogar, toda vez que según se desprende de la evidencia presentada, Pinto Rosado presentó resistencia a la ayuda que le brindó el Departamento; actitud que perduró en exceso de los seis (6) meses que dispone la § 443 k 3(a), *supra*.

Surge de los autos que el Departamento removió al menor del hogar en el que residía con su bisabuela Pinto Rosado, debido a la mala higiene que existía en el mismo y por razón de que el menor se encontraba agrediendo a Pinto Rosado. Una vez concedida la custodia provisional del menor al Departamento, se diseñó un plan de tratamiento para el menor, en el que se recomendaba el retorno al hogar. En atención a ello, fueron autorizados los servicios de un ama de llaves para que ayudara a Pinto Rosado a habilitar el hogar. No obstante, dicha ayuda fue rechazada por Pinto Rosado. Siendo la falta de higiene una de las razones por las cuales el menor fue removido del hogar, la actitud de Pinto Rosado de rechazar la ayuda del ama de llaves, y de evitar que personal del Departamento la visitaran en su residencia, representaba una actitud de resistencia al cambio.

Además, de las declaraciones de los testigos que declararon en la vista final, se demuestra que Pinto Rosado demostraba una actitud sobre protectora sobre el menor, al punto de evitar que éste se desenvolviera en actividades propias de su edad. Dicha actitud sobre protectora persistió aun cuando el menor se encontraba recibiendo tratamiento en Mepsi Center, razón por la cual sus visitas tuvieron que ser reguladas por personal de la institución.

Nótese también, que la remoción del menor de su hogar ocurrió el 13 de septiembre de 2000, y que la vista final del caso fue celebrada el 6 de junio de 2001; lo que demuestra que Pinto Rosado tuvo un período aproximado de 8 meses (en exceso del dispuesto por la sección 443 k 3 (a), *supra*) para aceptar la ayuda que le brindó el Departamento, y para demostrar, al menos, un interés en cambiar sus actitudes, en bien de su bisnieto, lo que no ocurrió.

Por otro lado, en cuanto al señalamiento de que erró el Tribunal al no hacer partícipe a Pinto Rosado, del plan integral de salud mental, tampoco le asiste la razón.

Dispone la Ley de Salud Mental, Ley Número 408 de 2 de octubre de 2000, en su artículo 7.06 que *"el menor que recibe los servicios participará en la formulación y revisión del plan, en el grado en que sea posible dicha participación. Siempre se requerirá la participación del familiar más cercano, ya sea el padre o la madre con*

*patria potestad o custodia, su tutor legal, **o la persona que tenga la custodia provisional**, en la formulación y revisión del Plan Individualizado de Tratamiento, Recuperación y Rehabilitación".*

Así pues, nótese que la propia disposición establece que el familiar cercano comprende al: (1) padre o madre con patria potestad o custodia; (2) al tutor legal; o (3) persona que tenga la custodia provisional del menor. Por lo tanto, siendo este el caso, en que la custodia provisional del menor la ostentaba el Departamento, correspondía a éstos participar en la formulación y revisión del Plan. En consecuencia, los primeros tres errores no fueron cometidos.

En términos del cuarto error señalado, somos del criterio que en atención del mejor bienestar del menor procede que el Departamento, en unión al personal de Mepsi Center, determinen si es beneficioso para el menor que continúen las visitas de Pinto Rosado. Ello debido a que el mejor bienestar del menor no sólo conlleva el mantener los lazos afectivos habidos entre K.S.D.J. y Pinto Rosado. Nótese que es incuestionable el hecho de que el menor K.S.D.J. está en la etapa de la adolescencia, etapa de por sí difícil para el manejo de los hijos, máxime si se trata de una persona como Pinto Rosado, quien presenta actitudes de sobre protección que han impedido que el menor tenga un desarrollo normal para un niño de su edad. Ello en adición al hecho de que es una persona de edad avanzada, cuya salud en cualquier momento puede verse deteriorada, a pesar de que no presenta enfermedad alguna en este momento que la incapacite. Además, quedó demostrado que ésta no tiene controles sobre el menor, lo que en situaciones extremas podría culminar en que Pinto Rosado fuera nuevamente víctima de agresión por parte de K.S.D.J.

Por último, lo alegado por Pinto Rosado, en cuanto a la eliminación de ciertos documentos del apéndice del apelado, no daría lugar a que este Foro tomara otra decisión que no fuera la de confirmar la del Tribunal de Primera Instancia.

En atención a lo expuesto, confirmamos la Sentencia dictada el 24 de septiembre de 2001, por el Tribunal de Primera Instancia, Sala Superior de Arecibo.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida I. Oquendo Graulau
Secretaria General